## EVANS *et al. vs.* LIPSCOMB *et al.*

1. Is the remedy given by the Act of the 15th of January, 1852, entitled, ''an Act to regulate the mode of suing the bonds of Executors, Administrators and Guardians,'' applicable to any controversies, other than matters of account, strictly based upon returns to the Ordinary, and limited to surcharging for items improperly entered, or omitted, or undercharged, or overcharged? Query?

2. It is not error in the Court, to charge the Jury, on request, that, when a witness testifies to facts, incoherently, or inconsistently, that circumstance goes to his credit, and if his testimony be very incoherent or inconsistent, it should be considered with great caution.

3. The *general rule*, governing parol gifts of chattels, is, that to constitute a valid gift, there must be an actual delivery of the chattel at the time of the gift, accompanied by words characterizing the act as a gift; and the act done and the words spoken, must clearly establish the transfer of dominion over the chattel from the donor to the donee.

4. A delivery of a chattel, preceded and followed by declarations of the party delivering it, that he had given the chattel to the party receiving it, though none of these declarations were precisely contemporaneous with the act of delivery, may constitute a valid gift, *provided* that the delivery be followed by a continuing possession in the party setting up the gift, of such a character as to indicate an abandonment of dominion by the former owner, and its acquisition by the possessor; and all the facts evincing change of dominion should be closely scrutinized.

Debt, in Troup Superior Court. Tried before Judge BULL, at the May Term, 1860.

This was an action brought against Mrs. Harriet Lipscomb and her securities, on a bond given by her, as the administratrix of the estate of Mildred Bowling, deceased, to recover the amount due Thomas J. Bowling, William D. Bowling, and Archibald W. Tyre, in right of his wife, Mary M. Tyre,

---

**PAROL GIFT OF CHATTEL.** ''In the case of Andrews v. Baker, 1 Ga. 595, this court ruled that **to constitute a valid parol gift of a chattel, there must be an immediate delivery** of the same by the donor to the donee. And in the case of Mims v. Ross, 42 Ga. 121, McCay, J., said: ''To make out the gift it would require proof of present intention to give—a complete renunciation of right, by the father, without power of revocation, and a full delivery of possession, as a gift, inter vivos.''

formerly Mary M. Bowling, as distributees of the estate of the said Mildred Bowling, deceased.

The plaintiff alleged in his declaration the following breaches of the bond sued on, to wit:

1st. That the administratrix had not made a full inventory of the said estate and exhibited the same to the Ordinary.

2d. That she had not well and truly administered said estate, and rendered a just account of the same.

3d. That she had not paid said estate. or the proceeds thereof, to the persons entitled to the same by law.

Upon the trial of said case, the following testimony was introduced and submitted to the jury, to wit:

### Evidence for the Plaintiff.

John Motley, sworn, said: He knew Mildred Bowling in her lifetime, and knew her property. She owned a plantation in Heard county, on Brushy Creek, of about 300 acres, 202½ acres worth $12.50 per acre; and ½ lot, 100½ acres, pine land, worth $5.00 per acre. Knew her to have her negroes on this place, and she carried on farming business there, in 1855.

Winny, worth about $200; Aaron, about 45 years old, worth $1,200 or $1,300; Margaret, 35 years old, worth $1,000; Martha, 15 years old, worth $900; Mary, about 20 years old, worth $800 or $900; George, about 14 years old, worth $800; Greene, 15 or 16 years old, worth $1,000; Frances, 15 or 16 years old, worth $900; Harriet, 10 or 11 years old, worth $500.

Margaret had two or three children; Frances had a child; did not know them sufficiently to be satisfied with his opinion as to their value. Witness was then asked the value of some of the negroes for hire. To this defendant objected, and objection was overruled.

Aaron was worth, average, per annum, $120; Margaret and her small child, $30 or $40; Martha, $70; Mary, $70; George, $80; Greene, $80; Frances, $75.

Plaintiff then proposed to question witness as to present or increased value of the property. Defendant objected, and objection was overruled. Being questioned, he answered:

Martha, $1,000 or $1,100; George, $1,200; Greene, $1,200; Frances, $1,000; Harriet, $600; Margaret is dead; Winny, worth nothing; Aaron, $900.

---

In Evans *v.* Lipscomb, 31 Ga. 71, the general rule was stated to be, that, in order to constitute a valid gift, **there must be an actual delivery of the chattel at the time of the gift,** accompanied by words characterizing the act as a gift; and the act done and the words spoken must clearly establish the transfer of dominion over the chattel from the donor to the donee. And in Burney *v.* Ball, 24 Ga. 505, it was ruled

The negroes were working together with Mrs. Lipscomb's at her death; were under Mr. Turner. Saw the hands on Mrs. Lipscomb's place, near Brushy Creek place. Did not see the old negroes and children; saw the hands there; Mrs. Bowling had farmed to herself, and had a separate overseer, 1854, and previously.

RE-EXAMINED. Mrs. Lipscomb's and Mrs. Bowling's negroes worked both places, in 1855, together.

Emanuel Britain sworn, said: Some time in the fall of 1854, about the time Mrs. Bowling and Mrs. Lipscomb were moving to LaGrange, witness met them in the road near Mrs. Lipscomb's place, between the river and Houston; they were in a carriage together. He had a conversation with them. Mrs. Bowling said, she and Harriet (Mrs. L.) had concluded to put their forces together and farm together; and this was in reply to an expression of solicitude on the part of witness, at having heard that they were moving to LaGrange. She said, it would be a saving, and asked witness' opinion about it. Gresham was Mrs. B.'s overseer at that time. Witness knew several of the negroes, one or two. The value placed upon them by Motley was about right and fair. They said they were to go equal shares in the farm for 1855.

Timothy L. Harris, sworn, said: Just before Mrs. Bowling and Mrs. Lipscomb moved to town, while they were all sitting at Noah Lee's table, Mrs. Lipscomb said she and her mother (Mrs. B.) would move to LaGrange; that they had agreed to farm together, and would have one overseer, which would be convenient and a great saving. This was in reply to a question from Noah Lee, if their move to town would not injure them in their business matters, and what they intended to do with their hands and farming interest. Both ladies talked about it, and said in substance what Mrs. Lipscomb said in her reply.

James Edwards, sworn, says: He was with Mr. Brittain on the occasion he testified to. It was in the latter part of 1854, or first of 1855. In that conversation, Mrs. Lipscomb said to him that they were moving to LaGrange, and put their interests together, and would farm together and divide the profits. It was their land and negroes. They had moved some of their things to LaGrange. Witness was called, with others, to estimate the crops growing on the Brushy Creek place in fall of 1855. It was in corn. Judging from

that the **acts and declarations of the donor** that he had given the property are **admissible in evidence;** but that to constitute a good and valid gift of personal property there must be a delivery, actual or symbolical, or a writing." Burt *v.* Andrews, 112 Ga. 467. Our Code, which is but a codification of the common law on the subject, states the rule thus: "To constitute a valid gift, there must be the intention to give by the donor, acceptance by the donee, and delivery of the article given, or

its appearance, 100 acres, make 4 bbls. to an acre, worth $250 to $1,000. (Objected to. Overruled.)

Harriet, about 12 years old, worth $600; Orlando, worth $400.

Priced the negroes about as Motley did. Knew them. Saw another child worth but little. Mrs. Bowling was about 75 years old. The negroes were on Mrs. L.'s place at Mrs. Bowling's death. Judged of crops in field; it was 1855 crop. Gresham was overseeing for Mrs. Bowling at the time of the conversation, and in 1854 for the year. Does not know that Aaron has been frequently sick. Mrs. Bowling told him a year or two before that she wanted to sell her land. Did not hear her speak of it then. Does not know that it was offered for sale after she came to LaGrange.

Sanford H. Dunson, lived near the places of Mrs. Bowling and Mrs. Lipscomb; saw the negroes in 1855. They were at Mrs. Lipscomb's place. They worked on both farms, backwards and forwards. He was with Mr. Edwards in estimating crop (objected to, and overruled), on Brushy Creek place. It was worth $1,000. The houses were good, and house-room plentiful on Mrs. Lipscomb's place. There was scarcely any houses on Mrs. Bowling's place, and they not comfortable; made calculation as Edwards.

Charles W. Hearn: Saw Mrs. L. and Mrs. B. in fall of 1854, at Mrs. Lipscomb's; had a conversation with them about moving to LaGrange. They said they were going to live together. It would be pleasant and a saving. The interrogatories, except those of Aubrey and wife, were then read.

John W. Bellah: Is overseeing for Mrs. Lipscomb, now Mrs. Standford. Knows the negroes.

John, worth $400; Harriet, worth $550; Harlan, about 4 years old, worth $350; another child of Martha, walking, about $250; another child of Frances, $200; Orlando, worth $400. They are all likely young negroes. Margaret's child diseased. He knew a gin worth $65. It was afterwards sold at administrator's sale for 25 cents. There had been a sale of perishable stuff before. Nothing else sold that day. It was bought by Mr. Turner, the overseer at the time; Nathan Strong, the bailiff, witness, and Turner, were present. (About gin objected to; overruled.) Knows Aaron; does not know of his being diseased.

some act accepted by the law in lieu thereof." Civil Code, §3564. There must be in every case a delivery of some sort, such a delivery as would put it beyond the power of the donor to revoke the gift. He must relinquish all dominion and control over it as owner, and part absolutely with the title. Evans v. Lipscomb, 31 Ga. 71 (3); Mims v. Ross, 42 Ga. 121 (2); Smith v. Peacock, 114 Ga. 691 (1)." Harrell v. Nicholson, 119 Ga. 460.

He is about town; worth $900, if not diseased. Margaret is unsound, and sick nearly all last year; not worth much. Martha and two children, since she had them for hire, worth $50 per annum; Frances about $60. Has known the negroes since 1851; has been worth the hire of Margaret to keep her and her children. Supposed the sale had been advertised, as such sales usually are. The crier cried the gin as long as he could get a bid. There were three bids. Does not know and did not hear that Turner bought the gin for any one. Margaret is dead.

Dr. N. N. Smith, sworn, said: During the last illness of Mrs. Bowling, and a short time before her death, two or three days, as witness was about to leave, Mrs. Lipscomb spoke to him about Mrs. Bowling's making a will. She said her mother (Mrs. B.) had given her money, and they had bought the place near LaGrange together; and asked witness if he thought Mrs. Bowling was in a condition to make a will; witness replied that he thought she was in a condition to make a will, but that he thought the matter could be safely deferred to another time. Mrs. Bowling died soon afterwards. Witness was her attending physician. She died 27th of February, 1855. His first visit was about the 1st of February, 1855. She did not specify other property. Mrs. Bowling was a woman of good, natural sense, though without an education. She was a woman of her own opinions, though uncultivated.

Plaintiff introduced the bonds dated June 4, 1855.

It was conceded that the time had been waived to bring up the question on its merits as to title, value, etc., as far as concerned the negroes.

It was admitted that Mildred Bowling paid tax on the property in 1854.

Plaintiff then introduced an exemplification of the actings and doings of Harriet Lipscomb, as administratrix, and the original vouchers filed by her therewith. (Objected to and overruled.) And to which reference is had. Timothy L. Harris said, Mrs. Lipscomb told him in 1854 that she had bought a carriage at Columbus, and her son, Thomas, had selected it for her.

N. M. Harris, sworn, says: Mrs. Lipscomb told him in 1854, that she had bought a carriage at Columbus, of Jaynes & Brother, for about $400.

B. C. Ferrell, sworn, says: He was present in the Court of Ordinary when the administration was granted to Mrs. Lipscomb; demand was made of Mrs. Lipscomb to make a bond sufficient to cover the negroes; she refused; but upon hearing the facts before the Ordinary, by mutual understanding and agreement between the parties, the bond was given for $12,000. The plaintiff insisted that the bond ought to be $16,000. Mrs. L.'s counsel remarking that it was immaterial what amount the bond was for. Mrs. Lipscomb claimed the negroes. Plaintiff closed.

*Defendant opened his Defence, and read Interrogatories.*

Dr. C. Holt, sworn, said: He is the physician of Mrs. Lipscomb's family. Has examined Aaron; he is badly ruptured and liable to die any moment. Can not do hard work, and is not worth more than 'half-price, either for sale or hire. Knows Margaret's small child; has dropsy of the head and is worthless. Martha has falling of the womb; worth about half-price, nothing for hire with her child. Margaret is dead; died of puerperal fever, he thinks. She and children, doctor's bills considered, worthless for hire.

Hernia is curable by an operation or by long and careful use of truss and other treatment. If taken in time, operation is most efficient, but dangerous. Prolapsus is curable by rest and other treatment. The rule is, they are possible of being cured. Martha is 34 or 35 years 'of age. Margaret died a few hours after he first saw her. No other physician called. She must have been sick some time. Aaron and Martha's dieases are both old chronic cases. Defendants closed.

*Rebuttal for Plaintiff.*

From interrogatories of Sample, Mrs. Bowling, Aubrey and wife. (Objected to and overruled.)

James M. Edwards, recalled: In 1853, at Mrs. Lipscomb's, Mrs. Bowling had a conversation about one of the plaintiffs, John Bowling. He was in Texas, or somewhere out West, and had gone out West, and had written to Mrs. Bowling for money to get back on. She was lamenting the disobedience of children, and said she intended to send him some money, though, she said, it was her opinion that she ought to give one as much as another, and that her duty was to do right; and if, after all she should do, the children throwed

it into the fire, she had nothing to do with it.   She said she
would do her duty, and give them their portion, and asked
witness if that was not right.   Witness agreed with her.   She
had frequent conversations with witness about the distribu-
tion of her property, and said in each, in substance, that she
would do her duty, and her conscience should be clear, and
that the law made a good enough will for her, and that she
would not make any will.   She said she expected to send
$10 to John Bowling.   Mrs. Bowling was in her dotage
rather; she was more childish as she grew older.   Witness
never examined her mind, and she always talked rational.
Mrs. Martha A. Sample's husband and Mrs. Lipscomb had
a good many lawsuits.

John Motley: His wife's brother married Mrs. Bowling's
sister.   He knew her intimately, and there was frequent visit-
ing between the families.   He heard her speak of the dis-
position of her property for thirty years off and on, and often
she said, the law made a good division or distribution for
her; that that was good enough for her.   On several occasions
he heard her say that her father had put all his property in
the hands of his son, John Dean, to give it off to his sisters,
and that she thought she never got her part.   Therefore, she
was not going to attempt to give off or divide; that the law
would divide it right, and then her children and grandchildren
could not complain of her after she was dead.

Timothy L. Harris: Has heard Mrs. Bowling say, at his
house and at Mrs. Lipscomb's, that the law made a good
enough will for her.   In November or December, 1854, he
heard her say, in a conversation with him, that she had been
very severely sick; that they had been at her to make a will,
or dispose of her property; that Dr. Pharr had spoken to
her about it; that the law was will enough for her, and that
the Bowling children were as near to her as anybody.

James K. Strickland: Had conversation with Mrs. Lips-
comb, at her house, in January or February, 1855.   Mrs. L.
said she had employed Mr. Turner as overseer, for 1855,
and wanted to know of witness if he knew him, and whether
he would do; said he was to work her place and her mother's
land on Brushy Creek, both.   That they had concluded to live
together; and Mr. Turner could attend to both places.   There
was nothing said about the hands working together.

Dr. R. A. T. Ridley, sworn, says: In 1857, he was called

to Mrs. Lipscomb, to see a sick negro, Mary. Mrs. L. said that Mrs. B. had given her Mary and one-half the land whereon they lived. It was shortly before or after Court that year, in spring, and she spoke of the suit, and said that the children had refused to let her have the girl, and the house and lot. She expressed regret that her mother had not made a will. Said she had spoken to Dr. Smith about it, and he was mistaken as to her disease, and thus she had not made a will. She said the Bowling children were spendthrifts, and wanted to know of him if something could not be done to preserve the property for them. His recollection is very indistinct, and he does not know that he remembers correctly what Mrs. L. said. She left the impression that the house and lot and Mary were the property in dispute; and she asked if something could not be done to preserve the property for the Bowling children. Witness thought she said that was all involved in the litigation.

### For Defendant.

Mr. Nathan Lipscomb, sworn, says: His sister, Mrs. Samples, was not at his mother's house at his grandmother's (Mrs. B.'s) death, but was living over the river.

### Interrogatories of Malinda Marr.

First interrogatory: I know John T. Bowling and Harriet Lipscomb; I have seen William T. Dansby, but do not know the other parties.

To the second interrogatory she answers: I was acquainted with Mildred Bowling in her lifetime. I knew her about fifty years. I have heard her speak of the disposition of her negroes—but not of other property. I have heard her say at many different times that she intended that her daughter, Harriet Lipscomb, should have *all* her negroes. This was in Heard county, Georgia, at my residence, about eight or nine years ago—all in one year. I do not recollect of hearing her say anything particularly about giving property to others, but I know that she had given property to her son, John Bowling.

To the third interrogatory she answers: I do not recollect to have heard Mrs. Bowling specify what she had given to her son, the father of the plaintiffs, in his lifetime, and to his family, or what she had given her daughter, Mrs. Lipscomb.

Evans et al. vs. Lipscomb et al.

I have already stated that I have frequently heard Mrs. Bowling say that she intended that her daughter, Harriet Lipscomb, should have *all* the negroes; that she wanted them kept together; that Mrs. Bowling (her daughter-in-law) had said to her that she (Mrs. Mildred Bowling) ought to let her have some of the negroes, particularly a negro girl, but that Mrs. Bowling—her daughter-in-law—should not have *her,* nor any of the other negroes, but that Harriet should have them all; I know of no other reasons assigned; and, further, know nothing more that will benefit the defendant.

### Answers to Cross-interrogatories.

To the first cross-interrogatory she answers: I have already answered when the conversation took place. The conversation in Heard county took place at Mrs. Lipscomb's, where Mrs. Bowling lived. Sometimes we were alone. Sometimes, I think, Harriet Lipscomb was present. Some of the negroes were on a plantation. I think one of the negroes was hired out that year, but am not certain of this fact. The conversations were not had in the presence of the negroes. I do not know that Mrs. Bowling continued to claim the negroes, as I had not seen her for five or six years before her death. I never heard Harriet Lipscomb say anything to her mother about making a, will, or any conversation such as is inquired about in this cross-interrogatory.

To the second cross-interrogatory she answers: The Bowling children were living on Mrs. Bowling's land at the time to which I have testified, about eight or nine years ago; further, of my own knowledge, I know not. I have already stated that Mrs. Bowling was living with her daughter, Mrs. Lipscomb. She was not very infirm at that time; her mind, I think, was as good then as it ever was. She was then sixty-three years old, or thereabout. Harriet Lipscomb was very kind to her mother. I have already stated all that I know about Mrs. Bowling's intentions, and who was present, and know nothing more in favor of plaintiffs.

To the third cross-interrogatory she answers: John Calvin Johnson and David Blalock were present at the taking of my interrogatories. No person has consulted me about my answers. I have not seen Mrs. Lipscomb for eight or nine years. She has not written to me on the subject. A gentleman brought the interrogatories to me; his name I have forgotten.

He said he wished me to answer them, and said nothing more to me. I am the sister of Mrs. Mildred Bowling, and consequently the aunt of Mrs. Lipscomb. I have lived for the last five or six years—each year and every year—with my brother, Captain John Dearee, who resides in Clarke county, Georgia, and have remained with him all that time, except when absent on visits, say once or twice each year.

her<br>
MALINDA X MARR.<br>
mark.

Answered, subscribed and sworn to before us, this, the thirteenth day of October, eighteen hundred and fifty-six.

JOHN CALVIN JOHNSON, Commissioner, [L. S.]

DAVID BLALOCK, Commissioner, [L. S.]

### Interrogatories of Robert Gresham.

The first interrogatory witness answers: I do.

To interrogatory second, he answers that he was acquainted with Mrs. Mildred Bowling in her lifetime; knew her about fifteen years; worked for her about four years; thinks the first year was in 1849; then in 1852, 1853 and 1854, as overseer.

To interrogatory third, he answers: That Mrs. Bowling, as mistress, and he, as overseer, had control of her negroes during the year 1854. Mrs. Bowling had a conversation with him as to the disposition of her negroes, on or about the first of December, 1854. Witness was at the house of Mrs. Harriet Lipscomb, when Mrs. Bowling asked him, "how long it would be before he got through gathering his crop?" Witness replied that "it would be nearly a week." She then observed, "that the reason she asked the question was that she wanted him to get through soon, as she wanted to deliver the negroes up to Harriet."

To the fourth, he answers, that he has answered the first question in answer to third interrogatory.

When witness got through with the negroes, he sent word by his wife to Mrs. Bowling. * * * In two or three days, a boy, hired for that year by Mrs. Bowling, came with Mrs. Harriet Lipscomb's cart for the negroes, and took them away; and he saw them a few days afterwards at Mrs. Lipscomb's plantation.

To interrogatory fifth, he answers: He heard Mrs. Bowling state that she "had given the negroes to Mrs. Lips-

comb; for that, previous to this gift, she had given the others more than she had given Mrs. Lipscomb." She said, also, "that she had done a good deal for the others, but they did not take care of what they had, and it seemed of no use to give them anything more."

To interrogatory sixth, he answers: Mrs. Bowling then offered her plantation for sale; witness thinks at $3,500. Thinks she at first intended to rent the place, if it did not sell; but afterwards heard Mrs. Bowling say to Mrs. Lipscomb that, "if she was not satisfied to live where she was, she, Mrs. Bowling, would give Mrs. Lipscomb her place, provided she, Mrs. Lipscomb, could sell it, and buy one that suited her." In 1855, Mrs. Lipscomb cultivated the place. Witness knows nothing of who gave Mrs. Lipscomb permission, except what he has already stated.

To interrogatory seventh, he answers: That, some little time after the negroes went into the possession of Mrs. Lipscomb, he went to the house of Mrs. Lipscomb and she came into the room where witness and Mrs. Bowling were and spoke of the disorderly conduct of one of the negro women, former-ly Mrs. Bowling's. Mrs. Bowling replied that she had given them to her, and she, Mrs. Lipscomb, must manage them the best she could. Witness knows nothing more to benefit defendant.                            ROBERT GRESHAM.

Answered, subscribed and sworn, before us, this, the 29th of August, 1856.

LYMAN F. WILCOX, Commissioner.

JAMES BRADFIELD, Commissioner.

### Interrogatories of Mrs. Harriet Gresham.

To interrogatory first, witness answers: She knows the parties.

To interrogatory second, witness states she was acquaint-ed with Mrs. Bowling in her lifetime; knew her some four-teen or fifteen years. Witness heard Mrs. Bowling say she had given her negro property to Harriet. This conversation took place some time in December, 1854, when witness went to the house of Mrs. Lipscomb and informed Mrs. Bowling that the husband of witness had gathered the crop. Mrs. Bowling, at that time, said to her daughter: "Harriet, you must send up for them; send a wagon or cart."

To interrogatory third, witness answers: That she knows

nothing more of the gift and delivery of the negroes, except that a few days after the above conversation, Mrs. Lipscomb's cart came and took away some of the negroes, and about three months after, saw the negroes at Mrs. Lipscomb's plantation working with the negroes of Mrs. Lipscomb. Witness, some time previous, heard Mrs. Bowling say that "what she gave William Bowling, she intended to give in an education, that he might not spend it." Knows nothing more that will benefit defendant.

### *Answers to Cross-interrogatories.*

To the first, she answers: The conversation first mentioned took place at Mrs. Lipscomb's house. The last one referred to took place at the house of witness; negroes were not present at the time. Witness, and Mrs. Bowling, and Mrs. Lipscomb, were the only persons present at the first mentioned conversation, as witness now recollects; negroes were absent on plantation; don't know that Mrs. Bowling claimed an interest in the negroes up to the day of her death or shortly theretofore—not after the conversation at Mrs. Lipscomb's; don't know that Mrs. Bowling claimed the right to dispose of the negroes by will; don't know that Mrs. Lipscomb ever talked to Mrs. Bowling about disposing of her property by will; never heard Mrs. Lipscomb say anything to Mrs. Bowling about giving her property to her or any one.

Interrogatory second: Witness don't know where the Bowling children lived after the death of their father.

Mrs. Bowling lived with Mrs. Lipscomb during the time of witness' acquaintance with her. Witness does not know her age, but she was an old woman; was quite strong and healthy for a woman of her apparent age. In 1854, she was able to walk over the plantation and visit the witness, who lived a mile from where Mrs. Bowling lived. Mrs. Lipscomb took good care of her mother; witness saw no evidence of a weak mind; witness does not know when the gift was made. At the conversation referred to at Mrs. Lipscomb's; Mrs. Bowling spoke as though she had given them before, and then directed her to send for them. I have already stated who was present.

To interrogatory third, she answers: The commissioners, my husband and myself, are the only ones present at the

taking of these interrogatories. No one has consulted with me about my answers. Witness is not related to Mrs. Lipscomb as she knows of. Witness, for the last five or six years, has lived at home, in Heard county, Georgia, and lives there now.                                        her

HARRIET X GRESHAM.

mark.

Answered, subscribed, and sworn to, before us, this 29th October, 1859.

Lyman F. Wilcox, Commissioner.

James Bradfield, Commissioner.

### Interrogatories of Miss Phebe Mabry.

To the first interrogatory, she answers: I know Harriet Lipscomb and Daniel McMillan.

To the second interrogatory, she answers: I was acquainted with Mrs. Mildred Bowling; I knew her about two months before she died, in January and February, 1855, at the residence of Mrs. Harriet Lipscomb, in Troup county, Georgia. She did have a conversation with me about the disposition of her property, a few days before she was taken sick, in February, 1855, at the said Mrs. Lipscomb's said residence. She said she had given her negroes to her daughter, Mrs. Harriet Lipscomb, because she had previously given property to Polly Bowling's children, and they seemed not to take care of anything she gave them, and it never did them any good, and she did not intend that they should have any of her negro property.

To the third interrogatory, she answers: The reason she gave for not giving Polly Bowling's children any of the negroes, has been stated in answer to interrogatory second. She further stated that she wished the proceeds of the plantation to go to the payment of her debts, and the balance to be divided between Harriet Lipscomb and Polly Bowling's children; and she requested me to write to my brother, Charles W. Mabry, to come and write her will, as she had given Harriet Lipscomb her negroes, and wished to so state in a will, so that Harriet Lipscomb would not be put to unnecessary trouble in retaining them after her death.

### Answers to Cross-interrogatories.

To the first cross-interrogatory, she answers: All that I know relative to the gift of the property is what Mrs. Bow-

ling told me, and is stated in my answers to the direct and foregoing interrogatories.

To the second interrogatory, she answers: I remember of nothing further than I have stated in the foregoing answers.

Answered, subscribed, and sworn to, before us, this 11th day of September, A. D., 1856.          , PHEBE MABRY.

WM. W. GUNTER, Commisioner.

, WM. R. COURTNEY, Commissioner.

RICHARD B. YOUNG, Commissioner.

### Interrogatories of Noah Lee.

To the first direct interrogatory, he answers: I do.

To the second direct interrogatory, he answers: I was acquainted with Mrs. Mildred Bowling in her lifetime; I was acquainted with her about twenty-five or thirty years.

To the third direct interrogatory, he answers: I frequently heard her say that she intended to give her negroes to Harriet Lipscomb, about four years ago at Mrs. Harriet Lipscomb's house (then in Heard county), and she said the same words, at different times, at my house in this county; she said she wanted to keep the negroes together as long as Harriet Lipscomb lived; she said to me, repeatedly, that she intended to give her negroes to Harriet Lipscomb; and she said farther, that she had put the negroes into the possession of Harriet Lipscomb, and she did not design to carry on her farm any longer.

To the fourth direct interrogatory, he answers: She, Mrs. Mildred Bowling, said she intended to sell her land and pay her debts first, and the balance of the money she intended to divide among the children of Mrs. Mary Bowling. Her negroes, she said, it was no use to give any of them to the Bowling children, as they would only be squandered away. Part of her reason was that she wanted her negroes to be kept together; and that was the object in giving the negroes to Harriet Lipscomb; so that the said Harriet would keep the negroes together, and in her own possession, during her, the said Harriet's, natural life. This is all that witness recollects on this part of Mildred Bowling's conversation.

To the fifth direct interrogatory, he answers: She said that it would be no use to give any of her negroes to plaintiffs, as they were of a spendthrift and idling disposition, for she did not want to have her negroes scattered. Witness

Evans et al. vs. Lipscomb et al.

does not recollect of the said Mildred saying anything about the money that Mrs. Lipscomb had to pay on account of the father of the plaintiffs, though in connection with this, she said she wanted Mrs. Lipscomb to have her negroes during Harriet Lipscomb's life.    *    *    *    *    *

To the first cross-interrogatory, he answers: That he did not see Mildred Bowling give her negroes to anybody, but that she said she had given them to Mrs. Harriet Lipscomb, and that she, said Harriet Lipscomb, had them then in possession. During the conversation, a negro woman came into the house (Mrs. Lipscomb's house), and Mildred Bowling said, her daughter, Harriet Lipscomb, wanted the woman, and Mrs. M. Bowling said she had bought the woman named Margaret for Harriet Lipscomb.

To the second cross-interrogatory, he answers: That he knows nothing more that will benefit the plaintiffs.

NOAH LEE.

Answered, subscribed, and sworn to, before us, this May 7th, 1856.

Wм. F. Formby, Commissioner.
Archibald G. Standford, Commissioner.

*Robert M. Turner's Interrogatories, taken by Defendant.*

To the first interrogatory, he answers: I do.

To the second interrogatory, he answers: I was acquainted with Mrs. Mildred Bowling from the spring of 1853 till 1855, when she died. I was acquainted with the negroes of Mrs. Mildred Bowling, the names of some of which was Aaron, Winny, Margaret, Martha, Frances, George, Green, who were field hands. I commenced overseeing about the 20th December, 1854, for Harriet Lipscomb, and found the negroes above named on her plantation, and one I moved there afterwards. I know nothing about Mrs. Mildred Bowling parting with her negroes to any one. Mrs. Mildred Bowling told me if she did not sell her land before I got ready to go to ploughing, I must cultivate it for Mrs. Harriet Lipscomb in 1855. The land was cultivated in 1854 by Robert M. Gresham for Mrs. Mildred Bowling. The negroes were in the possession of Mrs. Bowling in the year 1854 till the latter part of the year. I moved one negro to Mrs. Lipscomb's plantation by the direction of Mrs. Bowling.

To the third interrogatory: I never heard Mrs. Bowling

say she had given the negroes to Mrs. Lipscomb. I have stated all I know that will benefit defendant.

ROBERT M. TURNER.

Answered, subscribed, and sworn to, before us, this May 13th, 1857.

BENJAMIN S. ASKINS, Commissioner.

CHARLES J. McDOWELL, Commissioner.

*Robert M. Turner's Interrogatories, taken by Plaintiffs.*

To the first direct interrogatory, he answers: He does.

To second interrogatory: I had no conversation with any person about Mrs. Bowling's negroes during the year 1855, or any other year.

To third interrogatory: If Mrs. Bowling carried on any farm I did not know it.

To fourth interrogatory: I was overseer; I do not know whose negroes they were, but found them on Mrs. Lipscomb's plantation, except one negro woman, which I moved there by request of Mrs. Bowling as cook for me. I was employed by Mrs. Lipscomb, and I looked to her for my pay, as she employed me, and then nothing could be said about who should pay me.

To the fifth interrogatory: I heard Mrs. Lipscomb say nothing about any person overseeing Mrs. Bowling's negroes in the year 1855. Mrs. Bowling went to LaGrange in the fall or winter of 1854, and remained there until her death, as far as I know. I never heard Mrs. Bowling say anything about the title of the property. I know nothing more that will benefit the plaintiffs.

To the first cross-interrogatory, he answers as follows: She did, and she alone. Myself, Mrs. Lipscomb, Nathan and one of her daughters, I think, was present when we made the bargain.

Second cross-interrogatory: I did hear Mrs. Bowling say that she would let Mrs. Lipscomb have her land to tend in the year 1855, if she did not sell it. I know nothing more that will benefit the defendant. Nobody present but the Commissioners. ROBERT M. TURNER.

Answered, subscribed, and sworn to, before us, this 13th of May, 1857.

BENJAMIN S. ASKIN, Commissioner.

A. ALONZO A. WATTS, Commissioner.

Evans et al. vs. Lipscomb et al.

*Sarah Strickland's Interrogatories, taken by Defendant.*

To the first interrogatory she answers and says: I am not acquainted with Thomas C. Evans; I am acquainted with A. W. Tyre and wife, and with Harriet Lipscomb, formerly, but now Harriet Standford, but don't know Jno. W. Robertson, Daniel McMillan, nor Wm. F. Dansby.

To the second interrogatory, she answers and says: I was acquainted with Mildred Bowling in her lifetime. I never heard her say anything about her son, John W. D. Bowling, that I recollect; I heard Mildred Bowling say that she had done all that she ever intended to do for John Bowling, her grandson. I do not recollect that I ever heard her say anything about any of the rest of John W. D. Bowling's children, or what she intended to do for them. She said that she had done all that she ever intended to do for John Bowling. She said that she had stood John Bowling's security to keep him out of jail, and that she never intended to do any more for him. This is all that I now recollect that she said about it. I know nothing more that will benefit the defendant.

To the first cross-interrogatory, she answers and says: As well as I now recollect, I became acquainted with Mildred Bowling some nine or ten years since. She lived at Houston, in Heard county, with her daughter, Harriet Lipscomb, at the time I became acquainted with her, about two miles from where I resided. The conversation which I have testified about, took place at Mrs. Harriet Lipscomb's house, where her plantation now is, in Troup county; about three miles east of Houston, in Heard county, in this State. There was but one conversation; it has been some six or seven years since, as well as I now recollect. I can not recollect precisely the time, not having charged my memory particularly about the matter. I do not now recollect that there was any person present but myself and Mildred Bowling. She said that she had stood John's security to keep him out of jail, and she did not intend to do any more for him. These are the words and language as well as I can now recollect. I have given her language as well as I recollect. I do not now recollect whether Mrs. Harriet Lipscomb was present or not. I will be twenty-two years old on the 30th of July next. I have stated all that I know about the matter. I do not know whether Harriet Lipscomb is entitled to all the property or

not; or what, or any part she is entitled to. I know nothing more that will benefit the plaintiffs.

SARAH STRICKLAND.

Answered, subscribed, and sworn to, before us, this 13th May, 1859.

WARREN L. STRICKLAND, Commissioner, [L. S.]

BLAKELY L. HARRIS, Commissioner, [L. S.]

*Dr. Edwin Pharr's Interrogatories, taken by Plaintiffs.*

To the first direct interrogatory, he answers: That he is acquainted with the parties, except John W. Robertson.

To the second direct interrogatory, he answers: I am a physician, and my business, the practice of medicine. I was acquainted with Mrs. Mildred Bowling in her lifetime. I knew her since the year 1849, up to the time of her death. I have rendered her professional service ever since the year 1850, up to a short time before her death, as a physician. In the month of July, 1851, Mrs. Mildred Bowling had a very severe "attack" of sickness. Mrs. Mildred Bowling asked me if I thought she would recover; I told her I thought she would. I then asked her the reason why she asked me that; did she wish to make her will? She replied no, that the law was a sufficient will for her. This conversation occurred in the year 1851, in the month of July, at Harriet Lipscomb's house; and again in the month of November, in the year 1854, Mrs. Bowling told me the law was as good a will as she wanted; there was nothing more said about a distribution of her property at her death, at that time, further than above stated. This conversation occurred in the year 1854, at the house of Mrs. Harriet Lipscomb. In the year 1851, I considered her mind as strong and as firm, or firmer, than women generally of her age. In the year 1854, I considered that her mind had changed and was not so strong, but more yielding or rather more childish, and would yield more readily to the influences of those she loved, or that she had confidence in, than in the year 1851.

I was called to see Mrs. Mildred Bowling, in my professional capacity, on the third day of November, in the year 1854, and visited her daily up to the 15th of that month, and visited her occasionally up to the seventh day of December, 1854; was the last prescription that I put up for her case. She was then recovering from a very serious attack of typhoid

pneumonia, from which attack I don't think she ever fully recovered, but got up and about, and partially recovered, and soon after removed to my neighborhood, over near LaGrange, at which place I saw her in January, or early in the month of February, 1855; and she was at the time in very feeble health. Some time between the third day of November, 1854, and the fifteenth day of the same month, Mrs. Harriet Lipscomb asked me to be plain and candid with her in relation to her mother's situation, whether I thought she would live or die. I informed her that I thought her mother's case extremely doubtful; my opinion was that she would die. I then stated to Mrs. Lipscomb that I had often heard her mother say that she intended to give her the negro girl, Mary, and I suggested that then was the time to have it in writing, to have the deed of gift made, so that there would be no fuss about it hereafter. She then requested me to mention it to her mother, and insisted that I should do it; and I did so; and when I mentioned it to Mildred Bowling, she told me that she had always intended to give Mary to Harriet Lipscomb, which she did in a few days afterwards, and I was present and witnessed the deed of gift, and after the deed of gift was signed, Mrs. Harriet Lipscomb requested me to mention to her mother that then was a suitable time to make her will, and dispose of the balance of her property, which I did. Her reply was that I had mentioned that subject to her before; and then told me and had told me before, that the law was as good a will as she wanted. I made the suggestion at Mrs. Lipscomb's request, and I did it as a friend to both, and she replied, as above stated, that the law was her will. The deed of gift was made just previous, and I do not recollect what happened just subsequent, but I think I went home and went to sleep. I am certain of that.

To the third interrogatory, he answers: That, after Mrs. Harriet Lipscomb and Mildred Bowling moved near La-Grange, and a short time previous to the death of Mildred Bowling, I had a conversation with Mrs. Harriet Lipscomb, and she stated to me that it was the wish of her mother for her to keep or have all the negroes of her estate, and that her lands and other property be sold and the Bowling children paid their portion in money, and if there was not enough, she, Harriet Lipscomb, was to make it up to them.

To the fourth direct interrogatory, he answers: I did have a conversation with Harriet Lipscomb, after the death of Mildred Bowling, in relation to the distribution or situation in which Mildred Bowling left her property. It was shortly after the death of Mildred Bowling, at the residence of Harriet Lipscomb, near LaGrange. Harriet Lipscomb told me that her mother's mind had changed considerably since they had moved down there, in relation to the distribution of her property, but she did not state, at that time, in what particular; but in a conversation in a few days afterwards, at the same place, Harriet Lipscomb told me that her mother had made a verbal will and gave her all the property, a very short time previous to her death.

To the fifth direct interrogatory, he answers that the question is as fully answered in the foregoing answers, as he could answer in this interrogatory. I know nothing more that will benefit the plaintiffs.

To the first cross-interrogatory, he answers: Mrs. Bowling was living at the house of Mrs. Harriet Lipscomb at the time of the sickness I allude to. I do not think she recovered fully from the last spell of sickness that I allude to. It was not in the early part of 1854, but in the latter part of 1854. I did not prescribe for her after the seventh of December, 1854. I was not with her in her last illness; I heard nothing after the seventh day of December, 1854, only from Harriet Lipscomb, in relation to the distribution of her property.

To the second cross-interrogatory, he answers that, after seeing Mrs. Bowling, in her previous illness, between the third of November, 1854, and the fifteenth of the same month, Mrs. Lipscomb asked me to be plain with her. I do not recollect if I did not state at first that I would be plain to Mrs. Lipscomb, until after she asked me to be plain with her; I then stated that I would be plain with her, and that I thought that her mother would not recover; but there was nothing said, at that particular time, about a will; but I told Harriet Lipscomb that I had often heard her mother say that she intended to give her the negro girl, Mary, and I, then, suggested, that then was the time to have it in writing. Mrs. Lipscomb did not reply that she could not mention such a thing to her mother, nor make such a disclosure; but she, Mrs. Lipscomb, requested me to mention to her mother

Evans et al. vs. Lipscomb et al.

about giving her Mary. Mrs. Lipscomb did not say to me to. do as I thought best about it, but requested me to mention it to her mother, which I did. She did not request me to disclose. any facts to her mother, at that time, further than is stated in the answer to this cross-interrogatory, that I now recollect.

To the third cross-interrogatory, he answers: I did not attempt to exert any undue or improper influence on Mrs. Mildred Bowling, at any time, and if Harriet Lipscomb did exert or attempt to use any undue or improper influence on her mother, I never discovered it. I do not now recollect, at this time, that I ever said so; perhaps I have said that I did not believe she did any such thing as to exert any undue influence on her mother. I know nothing more in favor of the defendant.                      EDWARD PHARR.

Answered, sworn to, and subscribed, before us, this 16th day of May, 1857.

JAMES LEWIS, Commissioner, [L. S.]
BLAKELY L. HARRIS, Commissioner, [L. S.]

*William Forbes' Interrogatories, taken by Plaintiffs.*

To the first interrogatory, he answers: I am acquainted with the parties.

To the second direct interrogatory, he answers: Had a conversation with Mildred Bowling and Harriet Lipscomb about the control of Mildred Bowling's negroes. I went to the house of Mrs. Harriet Lipscomb, for the purpose of making a trade or arrangement to oversee with and for Mrs. Harriet Lipscomb and Mrs. Mildred Bowling, and the following conversation ensued at the house of Mrs. Harriet Lipscomb: Mildred Bowling and Harriet Lipscomb, both told me that they intended to put their hands together and work Mildred Bowling's and Harriet Lipscomb's plantations together, and put some four or five hands, each together and crop together, and divide the crops equally between them, and bear equally the expenses in working the crop. The foregoing conversation took place in the early part of the year 1854. Mildred Bowling conversed with me, and Harriet Lipscomb conversed with me at the same time and place.

To the third direct interrogatory, he answers: Mrs. Harriet Lipscomb told me that herself and Mrs. Mildred Bowling intended to put four or five hands, each, together and go

halves in the expenses and profits in the year 1855. It was about the last of December, 1854, or the first of January, 1855, at the house of Mrs. Harriet Lipscomb. Mrs. Mildred Bowling was at the house of Harriet Lipscomb, and present at the time of the conversation. Mildred Bowling said she was to furnish four or five hands of her own in the above trade, and go halves in the expenses and profits of the crops for the year 1855.

To the fourth direct interrogatory he answers: That Mrs. Harriet Lipscomb told me that she wanted me to oversee for herself and her mother, Mrs. Mildred Bowling, if they did not get Mr. Gresham, for the year 1855. She said, herself and Mildred intended to put four or five hands, each, together, and farm together, and go halves in the expenses and profits of the two farms. I know nothing more that will benefit plaintiffs.

To the first cross-interrogatory, he answers: I went to Mrs. Harriet Lipscomb to be employed by her as an overseer; and this was my only business; and it was not, I considered it, material for her to explain to me how she held the negroes; found Mrs. Bowling. All the information I had about the condition of Mrs. Bowling's estate, was from Mildred Bowling and Harriet Lipscomb. My information from them was that she, Mildred Bowling, was to furnish four or five hands and an equal quantity of land with Harriet Lipscomb, and put all under one overseer, and go halves in the expenses and profits in the year 1855. I know nothing about the disposition of her property.

To the second cross-interrogatory, he answers: That he did not converse with Mrs. Lipscomb but one time on the subject. I was with her about one and a half hours. There was no one present but myself, Harriet Lipscomb, Mildred Bowling and a portion of Harriet Lipscomb's children. I do not now recollect which of the children. It was in the latter part, or near Christmas, in the year 1854, or the first part of January, 1855. Myself, Harriet Lipscomb, Mildred Bowling, and some of Harriet Lipscomb's children, I do not now recollect which portion of the children, or their names, was all that was present. I do not know anything more that will benefit the defendant. There was no person present at

the taking of these interrogatories, except myself and the Commissioners.

his<br>
WILLIAM X FORBUS.<br>
mark.

Answered, subscribed, and sworn to, before us, this 16th day of May, 1857.

JAMES LEWIS, Commissioner, [L. S.]

BLAKELY L. HARRIS, Commissioner, [L. S.] ·

*Sarah Awbry's Interrogatories, taken by Plaintiffs.*

To the first interrogatory, she answers: She knows the parties.

To the second interrogatory, she answers: She has heard a conversation with Mildred Bowling, and heard her say that she had not done as much for Polly Bowling as she intended to do, but intended her to have an equal "share" of her property at her death.

To the third interrogatory, she answers: She heard Mildred Bowling say she never intended to make a will, for the law was will enough, and as to Mildred Bowling being persuaded to make a will, and by whom, she does not distinctly recollect.

To the fourth interrogatory, she answers: She has stated all she knows in the second interrogatory, and that she knows nothing more than she has stated that would benefit plaintiffs. ·

First. She answers, in 1849, at Nathan Lipscomb's plantation, where Mildred Bowling frequently visited witness and, also, Polly Bowling; and witness asked Mildred Bowling, why she did not stay longer with Polly Bowling, and witness says Mildred Bowling said that she would, but Harriet, her daughter, would not let her, and this brought on the conversation in relation to the distribution of her property, and there was no one present.

Second. She answers, she has no recollection of any such conversation.

Third. She answers, that there was no one present but John L. Hurst and Edwin Pharr, who was engaged in taking my answers. Witness answers she knows nothing more.

SARAH AWBRY.

Answered and sworn to, and subscribed, before us, the 16th day of May, 1857.

JOHN L. HURST, Commissioner, [L. S.]

EDWIN PHARR, Commissioner, [L. S.]

*Thomas M. Awbry's Interrogatories, taken by Plaintiffs.*

To the first interrogatory, he answers: I know the parties in said case.

To the second interrogatory, he answers: I heard Mildred Bowling speak in regard to the distribution of her property after her death; I have heard her speak of it oftentimes, and she always stated that she intended John Bowling's children should have an equal "share" in her estate at her death. I can not recall all that she has said, but this is the substance.

To the third interrogatory, he answers: I have heard Mrs. Bowling say she had been requested to make a will, but the laws of her country was a sufficient will to divide her property, and consequently she would not make a will.

To the fourth interrogatory, he answers: Mrs. Bowling stated she wanted her property equally divided between John Bowling's children and Mrs. Lipscomb.

First. He answers: The commissioners' only were present at the taking of these answers. I do not recollect any one being present at the conversation referred to but my wife, and don't know that she was present all the time. I have stated about all that passed. Said conversation occurred at my house in 1849, and previous to that time I know nothing more.          THOS. M. AWBRY.

Answered, sworn to, and subscribed, before us, this 14th day of November, 1856.

JAMES LEWIS, Commissioner, [L. S.]

WILLIAM L. HUGHEY, Commissioner, [L. S.]

*Mary Bowling's Interrogatories, taken by Plaintiffs.*

To the first interrogatory, she answers: I am acquainted with the parties, except John W. Robertson.

To the second direct interrogatory, she answers: She was acquainted with Mildred Bowling in her lifetime. I knew her about twenty-eight years; I knew her intimately, as I lived in the house with her several years. When I first became acquainted with her, I considered her mind good, but in the latter part of her life, her mind was very wandering. I did not consider her obstinate, but would yield readily to the influences of those she loved. Mildred Bowling bought two hundred acres of land from Nathan Lipscomb, and I heard her and Nathan Lipscomb make the trade, and was present at the time of the trade, and she told me that she had

Evans et al. vs. Lipscomb et al.

bought the land for myself and her to live upon, and afterwards Harriet Lipscomb told her to sell the land and not live upon it, and she sold the land and afterwards bought the land back, but she never gave me permission to live upon it; however, she (Mildred Bowling), bought one hundred and fifty acres of land more from George and Thomas Lipscomb, and two hundred acres from Nathan Lipscomb, and Mildred Bowling told me that she wanted to put her negroes on the land, and wanted witness' sons to work with them and cultivate the land, and Harriet Lipscomb objected to it, in my presence, and Mildred Bowling declined the idea.

To the third direct interrogatory, she answers: I never had any conversation with Mildred Bowling about any property she had given away while in life. I had a conversation with Mildred Bowling about the distribution of her property after her death. She stated to me that she wanted her property equally divided between her son's children and Harriet Lipscomb. The above conversation occurred in the year 1852, at my house. She stated that she had been persuaded to make a will, but she did not wish to make a will; that the law of her country would divide her property equally among her heirs, and that was as good a will as she wanted.

To the fourth direct interrogatory she answers: I was at the house of Mrs. Harriet Lipscomb in December, in 1854, and I heard Mildred Bowling say that she had that day killed her pork for the next year, and was sending it up to her plantation for her negroes, for the year 1855. These were the negroes that are now in dispute. She did not say how much she claimed at that time; she did not say whether she had given any part, or any, or all away; she never said anything about giving any of it away in my hearing.

To the fifth direct interrogatory she answers: That she had a conversation with Harriet Lipscomb in February, in the year 1855, about her farming business for that year, and Harriet Lipscomb told witness that her and Mildred Bowling had employed Robert Turner to oversee for herself and Mildred Bowling; and Harriet Lipscomb further stated that the reason they had done so that herself and Mrs. Bowling had moved to LaGrange, and it would be more convenient for them to put their hands together and farm together and put them under one overseer to oversee both plantations; and Harriet Lipscomb further stated, that her mother, Mildred Bowling,

was to go halves in paying the overseer and all the expenses, and she (Harriet Lipscomb) was to pay the other half, and go halves in the property; she stated that her mother was well pleased with Robert Turner, that she liked him better than she did Robert Gresham; that is all that I now recollect in this conversation about the farming business. Harriet Lipscomb then asked me if I had heard the report that Mildred Bowling had bought that land, that she had moved to near LaGrange, and gave it to her; witness stated that she had heard the report but did not believe it, Harriet Lipscomb replied that witness need not believe it; that she (Mrs. Lipscomb) had heard that Mr. Hearn had told it, but she intended to ask Mr. Hearn about, and if Mr. Hearn had told it, it was not so.

To the sixth direct interrogatory she answers: That she had a conversation with Harriet Lipscomb after the death of Mildred Bowling; that Harriet Lipscomb sent for witness to come to her house the same day of the death of Mildred Bowling, when Harriet Lipscomb asked witness to walk into the garden, when she said that her mother had died without a will, and had left her property just so, and appeared to regret it very much; that she did not make a will and fix the property in the hands of witness' children, so that it could not be taken from them; and that her mother had always said that she wanted her negroes to have the privilege of picking their masters. The above conversation took place at the house of Harriet Lipscomb, near LaGrange, the day that Mildred Bowling died, in February, 1855, but don't recollect the day of the month. The next day, after Mildred Bowling's death, Harriet Lipscomb told witness that she was not so sure but Andrew Richardson could get little Sis's part. Speaking of Mary Jane Richardson, that she had often heard her mother say that she wanted that child to have its mother's part, and that if I could get two witnesses besides herself, that three witnesses could establish a will, so that child could get its mother's part, and you must study fast; if there is a will established it must be done in a short time; and that Harriet Lipscomb further stated, that she attended to the settling of her mother's business herself, and asked witness if she supposed she would be troubled by the creditors or witness' sons? Then Harriet Lipscomb further stated, she could tell witness of two things that she was not apprised of:

that her mother had given her half the place where she lived, near LaGrange, and a bill of sale to Mary, and upon parting at the grave of Mildred Bowling, Harriet Lipscomb requested witness and A. W. Tyre and wife to come over to her house in a few days and talk the matter over, and accordingly witness and A. W. Tyre went over to Harriet Lipscomb's house, when she (Harriet Lipscomb) appeared very distant and had nothing to say on the subject, until approached by A. W. Tyre, when she stated that she intended to attend to her mother's business herself, and that her mother gave her half the land where she lived and a bill of sale to Mary. Tyre asked her if that was all her mother give her, when she said it was, and if he did not believe it to go to the clerk's office and see for himself; and Tyre asked her if that was all she claimed that her mother gave her, when she said it was. Witness states, distinctly, that the above conversation, except the last one between Harriet Lipscomb and A. W. Tyre, was raised by Harriet Lipscomb; the last was raised by A. W. Tyre. I know nothing more that will benefit plaintiffs.

To the first cross-interrogatory, she answers: In my conversation with Mildred Bowling she did not say that she had given the girl Mary to Harriet Lipscomb. Mildred Bowling told me, at my house in the year 1852, that all the property she paid taxes for at her death would be equally divided between Harriet Lipscomb and my children; she said that she had not nor never intended to make a will. I do not now recollect that she said anything to me about listening to report.

To the second cross-interrogatory, she answers: That the character of her children for prudence, frugality, and correctness, is not, perhaps, as good as it ought to be. Yet she thinks their character for the above traits, are as good as children are according to their opportunity. I do not know that they are extravagant, or reckless, in money matters; I do not know that they make way with all they get, as they have assisted me in raising them and providing for the family. I never knew any of them to gamble or be in the habit of gambling, any or either of them. I never saw any cards, except cotton or wool cards, such as are generally used by women in carding and spinning cotton or wool cloth, in my house. I never knew them to have any decks of cards there.

I do not know whether other people knew it or not. I do not know they are always in debt. I do not know about their indebtedness. It is true, my children are very poor and have not been able yet to make property, and, consequently, not able to have property that they were not able to buy. I have not myself seen them or known them to play cards at any time or place. I do not know that such is their character and reputation. I never expressed any wish to buy the interest of my children, except John's. I once said that if it was so that I could manage John's interest for him, I would like to do so for his interest. I did not say that I would let him have it as he needed it, but that it might do him the most good, as I thought I was older and knew better how to dispose of it than he, having more experience. I did not say that I was afraid it would be gotten away from him for nothing, that I now recollect.

To the third cross-interrogatory, she answers: I am not interested in this suit; I have not expressed an intention to become so, that I now recollect. By Harriet Lipscomb's request, I went to her house, but not to seek conversations for the purpose of becoming a witness. I did not, at that time, know that there would ever be any controversy about the property; at the time, my feelings were such as a mother's feelings are usually for her children, but not altogethr in favor of plaintiffs. There was no person present at the taking of these interrogatories, except myself and the commissioners; William Forbus passed through the room once since I have been answering these interrogatories, but did not remain in the room one minute. I have seen Thos. J. Bowling, William D. Bowling, and Mary Tyre, the wife of A. W. Tyre, to-day. I have not seen John Bowling since January last. The most of the conversation that has passed between us, in regard to this case, was about the interrogatories that were lost; and about preparing to retake others in their lieu; there has nothing else on this subject, that I now recollect, passed between us. I know nothing more that will benefit the defendant.

her

MARY X BOWLING.

mark.

Answered, subscribed, and sworn to, before us, this 16th day of May, 1857.

JAMES LEWIS, Commissioner, [L. S.]

BLAKELY L. HARRIS, Commissioner, [L. S.]

Evans et al. vs. Lipscomb et al.

*Martha Sample's Interrogatories, taken by Plaintiffs.*

To the first direct interrogatory, she answers: I do (know the parties).

To the second direct interrogatory, she answers: I am the daughter of Mrs. Harriet Stanford, and granddaughter of Mildred Bowling, deceased. I have heard Mildred Bowling say she never intended to make a will; that the law would divide her property between her daughter and her grandchildren, Mrs. Bowling's children; I know that Mildred Bowling, at her death, owned a lot of land in Heard county, also a negro woman named Winney, about seventy years old, and worth about seventy-five dollars; Aaron, a man, aged about forty-five years, dark complexion, worth about nine hundred dollars; Margaret, a woman, about thirty-five years old, worth about seven hundred and fifty dollars; Martha, a woman of copper complexion, about twenty-one years old, and worth about one thousand dollars; Mary, a woman of dark complexion, about twenty-five years old, worth about one thousand dollars; George, a boy of dark complexion, worth nine hundred and fifty dollars; also, Green, a boy of dark complexion, aged about fifteen years, worth nine hundred dollars; Frances, a girl of dark complexion, about sixteen years old, worth about eight hundred dollars; Harriet, a girl of dark complexion, about six years old, worth five hundred dollars; Orlando, a boy, about three years old, of light or copper complexion, worth three hundred dollars; John, a boy of dark complexion, about three years old, worth three hundred dollars; and said negroes are worth, per annum, for hire, seven hundred and twenty-five dollars. The only property not above mentioned owned by Mildred Bowling, at her death, consisted of one horse, clay-bank color, worth about one hundred and twenty-five dollars; one dark bay mule, worth one hundred and thirty dollars; one buggy and harness, worth about seventy-five dollars; a small lot of household and kitchen furniture, and cooking utensils, worth about seventy-five dollars; also, a lot of stock, consisting of cows and hogs, worth about one hundred and thirty dollars; a new cotton gin, worth about seventy dollars.

To the third interrogatory,    *    *    *    *    *

To the fourth interrogatory, she answers: I heard Harriet Lipscomb say, in regard to her farming business, in the year

1855, that she and her mother, Mildred Bowling, were to farm together, each one to pay their own part of the expenses, and the crop to be equally divided between them; Robert Turner was their overseer, at the sum of one hundred and fifty dollars per annum, and his wages to be paid out of the joint funds, or each to pay half the said amount. I understood Mrs. Harriet Lipscomb, now Mrs. Standford, to say that Turner overseed for them both—herself and her mother, Mrs. Bowling. She said she had moved the property of Mrs. Bowling to her own place, because there was more house-room, and the other property was moved to the same place to have it taken care of, and for convenience; the property so removed comprised the whole of her negroes, stock, household furniture, farming utensils, etc.

To the fifth interrogatory, she answers: A short time after the death of Mildred Bowling, she heard Mrs. Lipscomb, now Mrs. Standford, say that she believed it was Mrs. Bowling's wish that she (Mrs. Lipscomb) should keep the negroes together, sell them off as she saw proper, and pay off the Bowling children in money, as she thought they needed it. Witness said to her that the Bowling children would not stand to that; that they would go to law first; she replied that it would take money to go to law. I have heard Mrs. Lipscomb, now Mrs. Standford, say that they had sent for Charles Mabry, Esq., to come down and make a will for her to dispose of her property, but that she was sorry that they never attempted to make any will.

The conversation came up by reason of a question asked by witness of Mrs. Lipscomb, whether Mrs. Bowling had made a will, to which Mrs. Lipscomb replied, she had not made a written will; I do remember it distinctly; I have stated all that I know that will benefit the plaintiffs.

To the sixth interrogatory, she answers: That Mildred Bowling could not write her name; witness knows that she could not, because Mrs. Bowling made her mark, and had frequently requested witness to learn her to write; she was about seventy-one or two years old at her death.

### Cross-interrogatories.

To the first cross-interrogatory, she answers: That she heard Mrs. Bowling say that some of her family had given all of her property to one child, but she never heard her say

Evans et al. vs. Lipscomb et al.

that it run in the family to do so; I have heard her say often she would like for her negroes to be kept together, if it could be so; I have heard Mrs. Bowling say that what she gave to the Bowling children during her life would be in money. I have looked upon the attached paper; it is my hand-writing, and I did hear Mrs. Bowling say what she is there represented to have said.

To the second cross-interrogatory, she answers: Mrs. Bowling's negroes were at my mother's plantation in the lifetime of Mrs. Bowling; they were sent there by Mrs. Bowling, and they lived there and worked my mother's land, as I under-stood and knew, in partnership between them; I knew, of my own knowledge, that Mrs. Bowling did claim said ne-groes, and that she laid in a part, if not all, the provisions for said year. Witness is of opinion that she furnished am-ply enough. I do not know in whose possession said ne-groes were.

To the third cross-interrogatory, she answers: I did hear my mother, Mrs. Lipscomb, say, after the death of Mrs. Bowling, that she had given her the negroes, and that she would have kept them together; I heard my mother say that Mrs. Bowling had given her the negroes, and sent them to her plantation, and that Mrs. Bowling had delivered them to her, etc.

To the fourth cross-interrogatory, she answers: I have, in my answer to the third interrogatory, fully answered this question, I now here repeat. I have heard my mother say that Mrs. Bowling had given her the negroes, and sent them to her plantation, and delivered them to her, and they were in her possession or on her plantation before Mrs. Bowling's death.

To the fifth cross-interrogatory, she answers: (Ruled out.)

To the 2d fifth interrogatory, she answers: My answers have been taken in this case before, and I am correctly repre-sented as saying that Mrs. Bowling said it did not run in her family to give all to one child; I do not recollect that I ever said that Mrs. Bowling paid for half the place on which my mother is now living; do not know that Mrs. Bowling ever paid anything for it; do not know that Mrs. Bowling's notes were given for any part of it; I have heard my mother say that Mrs. Bowling's notes were given for half the place.

To the sixth cross-interrogatory, she answers: I have

stated all I know going to show Mrs. Bowling (in the conversation enquired about) gave her negroes to my mother, and that they were on my mother's place, and in her possession before Mrs. Bowling's death, and have related all that I know that will benefit the defendant.

The evidence being closed, the jury returned a verdict in favor of the plaintiff for the sum of five thousand two hundred and fifty dollars.

Counsel for the defendant then moved for a new trial in said case, on the following grounds:

1. Because the Court erred in holding that hire of the negroes in dispute, accrued since the commencement of the suit, was recoverable in this action, and in admitting the evidence on this subject.

2. Because the Court erred in holding that the increase of the negroes, and the increase in value since the commencement of this suit, and the accrual of the cause of action was recoverable in this form of action, and in admitting the evidence on this subject.

3. Because the Court erred in admitting in evidence the returns made by the administratrix after the commencement of this suit, and the original vouchers accompanying said returns.

4. Because the Court erred in admitting to the jury the declarations of Mildred Bowling as to her intention not to make a will, and all the evidence of each party thereof, in relation to her dying intestate, and what her father did with his property, and all the declarations as to the distribution of her property at her death.

5. Because the Court erred in excluding from the jury the statement of Mildred Bowling, as shown by the certificate of the witness, Martha A. Samples, drawn up by the witness and adopted by her as part of her answer; and erred in allowing the balance of her answer on that subject to be read, and excluding that.

6. Because the Court erred in excluding from the jury the answers of the witness, Martha A. Samples, to the four last cross-interrogatories.

7. Because the Court erred in excluding from the jury the statement of Mildred Bowling and the evidence of Noah Lee, and the other evidence going to show the amount of money advanced to the father of the plaintiffs, and the injury sus-

Evans et al. vs. Lipscomb et al.

tained by Nathan Lipscomb in becoming the security for John W. D. Bowling, the father of the plaintiffs.

8. Because the Court erred in admitting the evidence of Forbus, and all the other evidence of declarations by Mrs. Bowling and Mrs. Lipscomb, or either of them, of an *intention to farm* together in 1855.

9. Because the Court erred in admitting the evidence of John W. Bellah, in relation to the sale of the gin; and the evidence of Harris and others in relation to the purchase of a carriage.

10. Because the Court erred in charging the jury, that if they belived the negroes were the property of Mrs. Bowling, and had not been returned by Mrs. Lipscomb, as her administratrix, but claimed and used as her own, that then this action was maintainable for them, and they must return for the plaintiffs one-half the proven value of the same, and one-half the proven value of the hire.

11. Because the Court erred in charging the jury as it charged, and in holding this action was maintainable under the facts proven.

12. Because the Court erred in charging the jury that the declarations by Mrs. Bowling of an intention to give the negroes to Mrs. Lipscomb, and, also, the declarations that she had given them, were not sufficient to prove a gift in law.

13. Because the Court erred in charging the jury, as requested by plaintiffs' counsel, "That, when a witness testifies to facts incoherently, or inconsistently, that circumstance goes to the credibility of the witness; and if the manner is very incoherent, or inconsistent, the testimony should be considered with great caution."

14. Because the Court erred in charging the jury, as requested by plaintiffs' counsel, "That if the jury should be of the opinion that Mildred Bowling, being an aged woman, lived with her daughter, Harriet Lipscomb, and that said Harriet Lipscomb managed her business affairs for her, then even if they should be of the opinion that said Harriet, as such, was in possession of the negroes, that fact is consistent with the title of Mildred Bowling, and her possession was the possession of her mother-in-law.

15. Because the verdict of the jury was contrary to the charge of the Court, in this, to wit: The Court charged the jury that, if Mrs. Bowling delivered the negroes to Mrs.

Lipscomb in her lifetime, with the intention to give them to her, they must find for the defendant, as this gift or no gift was the question here involved; and that, if Mrs. Bowling directed Mrs. Lipscomb to send and get the negroes with intention to give them, and she did send and get them, this was as good a delivery as if she had taken them by the hand and turned them over to her, saying: "Here, take these negroes; I give them to you"—the defendant insisting that this delivery was clearly proven, and no evidence contradictory was introduced or offered.

16. Because the verdict of the jury was contrary to law, there being no evidence that the defendant had violated the law in any particular, or had ever failed or refused to account with plaintiffs for anything.

17. Because the verdict of the jury is contrary to evidence and law, and strongly and decidedly against the weight of evidence.

18. Because the verdict of the jury is contrary to the evidence on the subject of value, and is excessive.

Upon hearing this motion for a new trial, the presiding Judge overruled the same on all the grounds taken, except the eighteenth and last ground, and overruled the motion on that ground also, provided that the counsel for the plaintiff shall, within ten days, write off from the amount of damages rendered by said verdict, all the excess above the sum of three thousand two hundred and seventy-one dollars and ninety-one cents, and on his failure so to do, the said Judge ordered that the verdict be set aside and a new trial be had.

This decision of the presiding Judge was excepted to, and brought up by both parties.

The defendant excepts, because the Court refused to dismiss the action, and because of the refusal of the Court to grant a new trial upon all the grounds taken in the motion.

The plaintiff excepts, because the Court granted a new trial, unless the damages should be remitted, as before stated, and because during the trial of said case, John Motley, being a witness on the stand, proved the value of the slaves in controversy at the time of the conversion, and was then questioned by plaintiff's counsel as to the increased value of certain of the slaves at the date of the trial, and on cross-examination, defendants' counsel asked the witness and proposed

to prove by him the depreciated value of certain others of the slaves, which the Court allowed, against the objection of plaintiff's counsel.

E. Y. HILL, N. M. HARRIS & B. H. BIGHAM, for the plaintiff in error.

B. H. HILL & C. W. MABRY, for the defendants in error.

*By the Court.*—JENKINS, J., delivering the opinion.

The record in this case is very voluminous, and it presents exceptions to different rulings of the Court by each party.

We will consider, first, the exceptions taken by the defendant in the Court below, and as each party is both plaintiff and defendant in error, we shall designate them by their positions, respectively, in the Court below.

1. The defendant excepts, *first,* on the ground that the Court "erred in not dismissing the action." We have searched the transcript, in vain, for evidence that any distinct motion was made to dismiss the cause before it had been submitted to the jury. The 10th and 11th grounds of the defendant's motion for a new trial, impute error to the Court, in having charged the jury, that in this form of action, and under the proofs, a recovery could be had for the value of the negroes in dispute, and their hire. This is the only trace we find in the record of exceptions made to the form of the action in the Court below. The plaintiff was evidently proceeding under the second section of the Act of January 15th, 1852, entitled: "An Act to regulate the mode of suing the bonds of Executors, Administrators and Guardians."

In this action, it has been attempted to inquire into advancements made, during her life, by the intestate; and the principal object was to try the title to certain slaves, of which plaintiff maintains that the intestate died seized and possessed, and which are in the hands of the defendant, as administratrix, but which the defendant insists are her own property, by gift from the intestate. We strongly incline to the opinion that the remedy given by the second section of the Act of 1852, is applicable, and was intended by the Legislature to be applied, only, to matters of account between the representatives of deceased persons and their legatees or dis-

tributees—or between guardians and their wards. Where the claim of the plaintiff is based upon the returns of the defendant to the Ordinary, impeached only by such surcharging of particular items, improperly introduced, or omitted, or overcharged, or undercharged, as may be conveniently set forth in the assignment of breaches of the bond, the remedy may be sufficiently appropriate; but when attempted to be used to try title to slaves, between the deceased and his representative, or to adjust unequal advancements, made by the deceased to his children or grandchildren, we think it due to the General Assembly to suppose that the attempt goes beyond their contemplation.

Presented as the exception is, in this case, and weakened by a consent equivocal in its terms, and differently understood by the opposing counsel, but clearly embracing the speedy decision of *the contested claim to the slaves*, we will not, on this ground, reverse the judgment.

The next exception, taken by the defendant, is, that the Court erred in overruling his motion for a new trial upon all of the grounds presented in the motion; and this brings them under review.

In his argument before this Court, defendant's counsel abandoned the first, second, third, fifth, sixth, eighth and ninth grounds. The tenth and eleventh (referring to the charge of the Court touching the sufficiency of the remedy), have been disposed of in considering the first exception. The fourth ground is error of the Court in admitting the declarations of Mildred Bowling (the defendant's intestate), of her intention not to make a will, and in regard to what her father did with his property, and all her declarations as to the disposition of her property at her death.

Throughout the trial of this case, the door for the admission of evidence was certainly very widely opened for the benefit of both parties. The tendency in the progress of jurisprudence has been to relax greatly the stringent rules of evidence to be found in the books, and this Court has already gone far to sanction this relaxation. Touching the precise question now under review, two of the Court are of opinion that the evidence was properly admitted, whilst the third, holding that it, with much of like character, might well have been excluded, deems it too immaterial—of too light a character—to warrant the supposition that it influenced

the finding of the jury, or to justify a reversal of the judgment.

The seventh ground assigns as error, the exclusion of the declarations of the intestate, and other evidence, going to show the amount of money advanced to the father of plaintiffs, and the injury sustained by Nathan Lipscomb, in becoming the security of John W. D. Bowling, the father of the plaintiffs.

There is nothing, whatever, in the pleadings, or in the consent, referring to advancements. If the defendant desired to have advancements adjusted, she should have either demurred to the action or pleaded them specially.

Who Nathan Lipscomb was, or how his injuries, resulting from his securityship for the deceased father of plaintiffs, is connected with the distribution of Mildred Bowling's estate, the record does not disclose, and this ruling of the Court seems to be quite right.

2. The thirteenth ground is, that the Court erred in charging the jury, as requested by plaintiff's counsel, "That, when a witness testifies to facts, incoherently or inconsistently, that circumstance goes to the credibility of the witness; and if the manner is very incoherent, or inconsistent, the testimony should be considered with great caution." We regard this charge as equally consonant with reason and with law.

All of the other errors, alleged by defendant's counsel against the charge of the Court, and against the verdict of the jury, except the eighteenth and last (in which the Court sustained them), may be resolved into this question—

Is the verdict of the jury sustained by the law and the evidence?

It must be borne in mind that the great question in the case is, as to the liability of the defendant, Lipscomb, in her character of administratrix, for the value and the hire of certain slaves. Plaintiffs allege title in the intestate at the time of her death. Defendant sets up title in herself, by gift from the intestate.

Plaintiffs prove possession of, and property in, certain slaves, by the intestate, in and near the close of the year 1854, she having died early in the year 1855. About this there is no dispute. Plaintiffs, also, proved the value and the hire of the slaves, and then closed their case.

Defendant put in evidence declarations of intestate, of her

intention to give, and of her having given, the slaves in dispute to the defendant, and also evidence as to delivery.

The declarations of *intention* to give, we put out of the question, as amounting to nothing.

The declarations that she had so given the slaves, were proven by four or more witnesses; but they were of the most general character, indicating neither time, nor place, nor manner, nor witnesses to the fact. All the circumstances clearly indicate that the gift, spoken of by intestate as having been made, was unaccompanied at the time of making it, by any delivery, actual or symbolical.

In *Anderson & Wife vs. Baker*, 1st *Geo. Reports*, 595, this Court held that, "to constitute a valid parol gift of a chattel, there must be an *immediate* delivery of the same by the donor to the donee." And again, "The bare declaration of the donor, that she had given certain negroes to the donee, is not sufficient to pass the title to the donee without evidence of *some act,* from which the jury may presume a delivery of the property where the donor remains in possession of the property, exercising dominion over it until her death."

In *Carter & Wife vs. Buchannon* (which was trover for a slave), 3d *Geo. Reports*, 513, this Court held, that "Declarations of the donor, made on the evening of the same day on which the alleged gift was made, but after it was made, to show that there was a gift, and the manner of it, are not admissible as parts of the *res gestæ,*" and justified the rejection of such evidence in proof of a gift.

How much less, then, are declarations of the donor admissible to prove the gift, which were made, we know not how long, after simply stating the gift, but not the manner and form of it?

The Court say, on page 517: "It is well settled that the acts of the party, or the facts, or circumstances, or declarations, which are sought to be admitted in evidence, are not admissible, unless they grow out of the principal transaction, illustrate its character, and are contemporary with it."

In both these cases, numerous authorities were cited and well considered. When we consider the great value, in Georgia, of negro property, and the facility of proving parol gifts by general declarations of the donor (often made playfully or inconsiderately), it is a subject of congratulation that

this Court, at an early day in its history, adopted stringent rules touching the proof of parol gifts. But these rules will avail nothing, unless rigidly enforced.

3. We hold, then, the general rule to be, that there must be, to constitute a valid parol gift of a chattel, an actual delivery of the chattel, *at the time of the gift,* accompanied by words characterizing the act as a gift—and further, that the act and the words spoken must be such as to signify clearly the transfer of dominion over the chattel from the donor to the donee. Such, we say, is the general rule; whether or not there may be declarations and circumstances, not precisely contemporaneous, but equivalent, as to intention and transfer of dominion, we leave to be determined as cases may arise. In this case we hold, that the *mere* declarations of the alleged donor, that she had given, etc., are insufficient to establish the gift.

4. But it is insisted that there was an actual delivery of the slaves in dispute, posterior to some of the proven declarations of the donor, that she had given, etc., and prior to other declarations of the same party of like import. These prior and posterior declarations, it is insisted, connected with the intermediate delivery, bring the case within the rulings of the Court—make a case equivalent to that involved in the general rule.

To that proposition we assent, with this qualification: that, as to the act of delivery relied upon was characterized by no contemporaneous words, the subsequent possession by the donee must be such as to show an abandonment of dominion by the donor, and its acquisition by the donee. The proof of delivery was briefly this: that the alleged donor directed her overseer, so soon as the crop of 1854 was gathered, to notify her of it, for "she wanted to deliver the negroes to Mrs. Lipscomb;" that, having gathered the crop, he afterwards notified her of it, and a boy, hired by Mrs. Bowling, came with Mrs. Lipscomb's cart and took the negroes away. He afterwards saw them on Mrs. Lipscomb's plantation. Other witnesses testify to having seen them there. Now, as the validity of this gift confessedly hangs upon the question of delivery, the character of the possession, acquired through it by the defendant, should be closely scrutinized.

Plaintiffs offered rebutting evidence to this point.

There were four witnesses, viz.: Brittain, Harris, Edwards

and Forbus, who testified to conversations with Mrs. Bowling and Mrs. Lipscomb, both present and participating, in which they spoke of an arrangement, made between them, to farm together, on Mrs. L.'s plantation, in the year 1855. Two witnesses, viz.: Mary Bowling and Martha Samples, testify to similar declarations, made to them by Mrs. L. alone. These conversations occurred about the last of 1854, or first of 1855. Some of these witnesses give the details of the arrangement as stated by the two, or by the defendant, and amongst them were these: that they should furnish, each, about an equal number of hands, about an equal amount of provisions, should contribute equally to bear the expenses, and equally divide the profits. The witnesses, Ridley, Pharr, Bowling and Samples, also testify to sayings of the defend-ant, shortly before and shortly after the death of the intestate, relative to these slaves, not at all reconciliable with the idea of title to them in herself.

This testimony was all before the jury; their verdict shows that they considered the transaction relied upon as a delivery, not consistent with an abandonment of dominion by the intestate, and an acquisition of it by the defendant. We think the rebutting evidence fully justifies their conclu-sion, and will not, therefore, set aside their verdict as against the law and the evidence of the case. This disposes of the defendant's exceptions.

The plaintiffs except to the judgment of the Court, *first,* because the Court granted a new trial, unless a certain sum be remitted from the damages, which were deemed excessive. After a careful review of the evidence, we agree with the Judge below, and for the reasons stated by him, that the dam-ages were excessive to the extent of the sum required by him to be remitted.

Plaintiffs except, secondly, that the Court erred in per-mitting the defendant to show that some of the slaves had depreciated in value since the conversion, after the plaintiffs had proven an appreciation in value of others, since the same event.

We sustain this ruling, for the reason that our practice al-lows in trover an alternative verdict, as regards the value of the slaves; that is to say, a verdict assessing, separately, in the damages the *value* of the slaves, to be avoided by de-livering the slaves to the plaintiff, within so many days; and

this form is almost invariably adopted.   But defendant has not the privilege of retaining some, and delivering others, of the slaves; he must deliver all of the slaves, or pay all of the money.   In this view, as well as in a general view of the subject, the jury should have evidence of the value of all, at any time, when the value of some was proven.

Finding no error in the numerous rulings of the Court, we affirm the judgment.

## JUDGMENT.

Whereupon, it is considered and adjudged by the Court, that the judgment of the Court below be affirmed, and that the plaintiffs be allowed, until the last day of the next term of the Superior Court of Troup county, to remit from the amount of damages, found by the verdict, the sum stated as excess by the Court in the judgment upon the motion for a new trial.